IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KATRINA ALLARD,<br><br>    *Plaintiff,*<br><br>v.<br><br>ALLEGHENY HEALTH NETWORK *and*<br>ALLEGHENY GENERAL HOSPITAL,<br><br>    *Defendants.* | Civil Action No. 2:24-cv-1705<br><br>Hon. William S. Stickman IV |

**<u>MEMORANDUM OPINION</u>**

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff Katrina Allard ("Allard") brought her three-count complaint under the Americans with Disabilities Act ("ADA"), 29 U.S.C. § 1201, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 42 P.C. § 951, *et seq.*, seeking damages and other relief for what she characterizes as a pretextual termination motivated by Defendants' Allegheny Health Network ("AHN") and Allegheny General Hospital ("AGH") (collectively, "AHN") discrimination and retaliation against her.[1]  (ECF No. 1, ¶¶ 33–35).  Allard contends that she was terminated because of her mental health disabilities and/or in retaliation for requesting a reasonable accommodation and taking short term disability leave.  (*Id.* at ¶ 37).  Pending before the Court is AHN's[2] Motion for Summary

---

[1] Allard alleges discrimination in violation of the ADA at Count I, retaliation in violation of the ADA at Count II, and discrimination and retaliation in violation of the PHRA at Count III.  (ECF No. 1, pp. 6–11).

[2] The defendants assert that "Allegheny General Hospital" is "not a business entity but a d/b/a for West Penn Allegheny Health System, Inc."  (ECF No. 22, p. 1, n. 1).  For ease of reference throughout, the Court uses "AHN" to refer to the defendants.

Judgment. (ECF No. 22). AHN requests that judgment be entered in its favor as Allard was terminated for violating its code of conduct when she engaged in a profane and disorderly outburst while serving as the charge nurse in AGH's Neurological Intensive Care Unit ("NICU"). (ECF No. 23, pp. 1–2). For the following reasons, AHN's motion will be granted.

## I.    FACTUAL BACKGROUND

Except for a brief break between March and June 2015, Allard was employed by AHN as a nurse at AGH from October 2013 until her termination on October 6, 2023. (ECF No. 24, ¶¶ 33, 198–212). She spent most of her tenure working in the NICU and had regularly worked as the unit's charge nurse. (*Id.* at ¶¶ 34, 36).[3] Allard was the president of the local nurse chapter of SEIU Healthcare Pennsylvania CTW, CLC ("SEIU") at AGH from early March 2020 until her termination, and she served on AGH's workplace violence committee, safety committee, bargaining committee, and the Nurse Coordinating Council ("NCC") staffing task force. (*Id.* at ¶¶ 39–40).[4]

In September 2019, upon the recommendation of her therapist, Allard requested to work overnight shifts no longer because of her post-partum depression. (ECF No. 24, ¶¶ 42–43). AHN granted that request, and Allard considered it an adequate accommodation. (*Id.* at ¶¶ 46–47). In December 2022, caring for a particular patient triggered Allard's post-traumatic stress disorder ("PTSD"), and her disorder substantially impaired her daily activities, including work, thereafter.

---

[3] As explained by Allard, a "charge nurse" is responsible for the entire unit during her shift, as opposed to certain patients. (ECF No. 35-1, p. 133). A charge nurse's duties include managing patient assignments, placing patients in beds, and general oversight of the unit. (*Id.*).

[4] Allard was familiar with AGH's resources for crisis response, workplace violence, and its Employee Assistance Program. (*Id.* at ¶ 38). She was aware of its standards of conduct as well, and she knew that a violation of them could result in termination. (*Id.* at ¶ 26).

(ECF No. 35-1, pp. 146–149). She requested accommodations for that condition on January 27, 2023, five days after the incident underlying this case. (*Id.* at pp. 151–152).

On January 22, 2023, Allard was assigned to work as the NICU's charge nurse from 7:00 a.m. to 7:00 p.m. (ECF No. 24, ¶ 79). The NICU was nearly at full capacity, and upon her arrival to work, Allard was informed by the outgoing charge nurse that multiple patients were near the end of their lives. (*Id.* at ¶ 81). Those patients included the patient in room 789 ("patient"), a coal miner suffering from a severe and extensive brain bleed. (*Id.* at ¶¶ 62, 81). Allard had a series of negative interactions with the patient's sister-in-law ("sister-in-law"), which culminated in the conduct that led to Allard's termination.

The dispute began over access to the unit's "family room." The patient's family had been granted access to the room the previous night and his sister-in-law requested to access it again. (*Id.* at ¶ 84). Allard denied the request, explaining that the room would be in use that day for "goals of care talks" with patient families. (*Id.* at ¶¶ 85, 87). The patient's sister-in-law responded that she did not believe Allard, which caused Allard to feel "a little depressed, sad" and "more stress." (*Id.* at ¶¶ 88–89). Later, Allard called Manager of Hospital Operations ("MHO") Fred Shaheen for assistance, who then sent security officers to respond to an overflow situation in the unit's waiting room. (*Id.* at ¶ 90–92). A security officer spoke with the sister-in-law, who subsequently "berated" the officer and Allard and expressed her dissatisfaction with the treatment of her family. (*Id.* at ¶ 95). The patient's sister-in-law then "questioned" Allard's character, directing rhetorical questions at her, *e.g.*, "who do I think I am to call myself a caregiver? Who do I think I am to call myself a nurse?" (*Id.* at ¶ 96–97).

As the patient's condition deteriorated, Allard advised his wife that any family members who had gone home should return to the hospital. (*Id.* at ¶ 99). The sister-in-law was still present

and, after a subsequent interaction, she threatened to report Allard to her supervisors and attempted to take a photograph of Allard's identification badge. (*Id.* at ¶¶ 101–102). Allard then became tearful, threw or "tossed" her badge at the nurses' station, loudly told a secretary to call the MHO because she needed someone else to take her assignment, and began to move "hastily" or "at a fast pace" through the hallway and towards the breakroom in full view of patient rooms. (*Id.* at ¶ 105). While she admits this conduct, Allard later stated during her investigative interview that it was the result of a "mental break." (*Id.* at ¶ 202); (ECF No. 34, ¶ 105).

Allard's termination letter, dated October 6, 2023, describes the details of her ensuing conduct while serving as the NICU charge nurse on January 22, 2023, the timeline of AHN's investigation of that conduct, and the AHN Standard of Conduct that she violated:

> On Sunday, January 22, 2023, multiple witnesses reported that, while acting as the Charge Nurse, you [Allard] displayed aggressive, intimidating, and belligerent behavior in the workplace. After a contentious interaction with a patient and their family, you were observed throwing your identification badge and angrily running through the unit yelling profanities. Upon entering the breakroom, you intentionally knocked over a garbage can and slammed the door. You then flipped over a table and shouted profanities that witnesses reported could be heard in patient-care areas. Witnesses described an uncontrolled "tirade" stemming from the fact that you were "angry" and "about to explode." They also reported that you ignored or refused multiple attempts to deescalate the situation.
>
> Before this conduct could be fully investigated, you began a medical leave of absence. At the outset of that leave, the Hospital informed you, in a letter dated Tuesday, January 31, 2023, that it would continue its investigation and take appropriate action, if necessary, upon your return to work.
>
> Immediately after you returned from leave on Monday, October 2, 2023, the hospital held an investigatory meeting with you on October 6, 2023. During that meeting, you admitted to physically flipping the garbage can and table. And although you claimed not to recall using profanity, multiple witnesses substantiated those claims.
>
>            \*        \*        \*
>
> As stated in the AHN <u>Standards of Conduct Policy</u> (5340055): "Employees shall abide by the organization's Values and Code of Business Conduct." The following are examples of violations of the code of conduct:

> "Deliberate inattention to patient care, or deliberately engaging in conduct detrimental to patient care."
> "Fighting, disorderly conduct, verbal outbursts, name-calling, use of language that is profane, vulgar, arguing loudly in a public area … or any behavior that is deemed to be intimidating or harassing."
>
> *     *     *
>
> Your conduct violated the Standards of Conduct. Specifically, among other violations of the Code, it was detrimental to patient care, disorderly, involved verbal and physical outbursts, and involved profanity. Your conduct was egregious and highly inappropriate, particularly in a patient-care setting. As a result, your employment is being terminated, effective immediately.

(ECF No. 25-4, p. 129) (punctuation in original).

Allard was later diagnosed with an acute stress reaction related to the incident described above. (ECF No. 34, ¶ 105). While she does not admit or deny shouting profanities while moving through the hallway, she otherwise admits that she engaged in the conduct described in her termination letter. (*Id*). This includes knocking over a trash can, pushing a chair, and flipping over a table. (ECF No. 24, ¶ 109); (ECF No. 34, ¶ 109). With respect to profanity, several nurses who were in Allard's vicinity reported that Allard yelled "that b**** can lick my p****" in reference to the patient's sister-in-law. (ECF No. 24, ¶ 106).[5] Multiple nurses left their assignments to attend to Allard's disruption in the breakroom. (*Id*. at ¶ 110); (ECF No. 34, ¶ 110). Two nurses then finished performing Allard's charge nurse duties for the rest of her shift. (ECF No. 24, ¶ 118); (ECF No. 34, ¶ 118).

Shortly thereafter, AHN initiated an investigation of Allard's conduct. (ECF No. 24, ¶ 155). After speaking with her clinician, Allard submitted a medical leave of absence request on January 27, 2023. (*Id*. at ¶ 164). Allard worked a regularly scheduled shift that day, and she

---

[5] During the Court's tenure, it has wrestled with how to include profanity in its opinions. The full text of Allard's statement can be found at ECF No. 24, ¶ 106, but it lies beneath the dignity of a judicial opinion.

5

worked again on January 29, 2023. (*Id.* at ¶¶ 160, 170). She requested that her leave of absence begin on February 3, 2023, which was approved. (*Id.* at ¶¶ 167–68).

Allard became aware of AHN's investigation into her conduct on January 30, 2023. (*Id.* at ¶ 174); (ECF No. 34, ¶ 174). On the following day, January 31, 2023, Allard received an email scheduling an investigatory meeting for that same day, and she confirmed that she would attend it. (*Id.* at ¶ 183). Approximately one hour before the meeting was scheduled to begin, Allard's husband informed AHN that she would no longer be in attendance because she was "seeking medical treatment." (*Id.* at ¶ 184). Allard was notified that her investigatory meeting would be rescheduled upon her return from leave, and AHN continued its investigation. (*Id.* at ¶¶ 185–86). That same day, on January 31, 2023, Allard chose to be admitted to a hospital for in-patient mental health treatment. She was discharged on February 3, 2023, the day her medical leave began. (ECF No. 24, ¶ 178).

AHN conducted fact-gathering interviews with seven NICU nurses who witnessed Allard's conduct. Those nurses corroborated the initial investigation conducted by the NICU manager, reporting that they witnessed or heard Allard run through the hallway crying, yelling vulgarities, creating a disturbance in the breakroom, and drafting an email to management while speculating whether it could help her avoid repercussions for her conduct. (*Id.* at ¶ 191).

Prior to her return to work, Allard requested various accommodations. She asked not to work as a charge nurse, to only be assigned daylight shifts, and to be assigned a new HR manager. (*Id.* at ¶ 193). AHN accommodated her request not to serve as a charge nurse and advised that she would have to coordinate with her coworkers to avoid working overnight shifts. (*Id.* at ¶¶ 194–195). It denied Allard's request for a new HR manager. Allard regarded the accommodations as reasonable and fair. (*Id.* at ¶¶ 196–197).

Allard's investigatory meeting was held on October 6, 2023, upon her return to work. (*Id.* at ¶ 198). Allard admitted to knocking over a trash can and pushing over a table during that meeting, but neither admitted nor denied using profanity. (*Id.* at ¶ 201). For the first time, Allard described her behavior as the result of a "mental break," and reported that she received a new mental health diagnosis during her in-patient hospital stay. (*Id.* at ¶ 202). After the meeting between Allard, NICU Nurse Manager Vicki Cohen ("Cohen"), Director of Nursing Amy Snyder ("Snyder"), and Employee Relations Lead Rachel Jones ("Jones"), it was decided by Cohen and Snyder that Allard would be terminated. (*Id.* at ¶ 208). That decision was grounded in the "egregiousness" of Allard's conduct on January 22, 2023, which Snyder later elaborated upon in sworn testimony:

> Q. When you say egregiousness of the behavior. Why did you consider it egregious?
>
> A. There is an expectation, a certain expectation, when you come into work, especially when you are acting as a leader in the environment she was that day. But an expectation for all our nurses, we have many employees that come in with mental health, physical issues. There is still a level of expectation they come to work, perform patient care that is required for them to perform, carry out their duties, and carry through with all their responsibilities in an appropriate and professional manner.
>
> Q. Did you feel that Katrina was not able to meet those expectations?
>
> A. Yes.
>
> Q. Did you discuss or consider Katrina's position in that investigatory interview, that she had a mental health issue that caused her behavior?
>
> A. Honestly, we are nurses, very compassionate. I sincerely feel bad and have compassion for that. On the other side, the flip side, there is an expectation that has to be met, and a requirement. It just was not met. Although I have compassion for that, there is still a standard, and a level of behavior.

(*Id.* at ¶ 209). Jones testified at her deposition that she has no reason to believe that Cohen and/or Snyder terminated Allard because of her disabilities or accommodation requests, nor has she seen any evidence that suggests so. (*Id.* at ¶ 215).

Following Allard's termination, SEIU filed a grievance that was denied and the matter proceeded to arbitration. After three days of hearings, Arbitrator Richard Bales held that the defendants had just cause to terminate Allard under their collective bargaining agreement for her behavior on January 22, 2023. (*Id.* at ¶ 233–234). Arbitrator Bales concluded that "less severe employment action" was not feasible because "The nature of Ms. Allard's outburst, the impact on Hospital operations, and the demonstrated inability to handle stressful situations in a professional manager raise significant concerns about her ability to function in any patient care role within the Hospital." (*Id.* at ¶ 235).

Allard admits that she does not believe that her "mental health crisis" excused her conduct on January 22, 2023, nor does she believe that she should not have been disciplined for it. (*Id.* at ¶ 217). Instead, she contends that termination was too severe a punishment for her conduct and maintains that she was treated by AHN in a manner less favorable than other similarly situated individuals who are not disabled. (*Id.*); (ECF No. 33, p. 23). According to Allard, she experienced years of disparate treatment by AHN management because of her activity as union president. (ECF No. 35-1, p. 111). She believed that AHN was "trying to get rid of her," as made evident—in her view—by a pattern of her supervisors "calling her in" for meetings. (*Id.* at 119–120). Allard claims that such meetings are common when AHN/AGH is trying to fire an employee, and she cites the experiences of others as proof. (*Id.* at 120–121). Allard reports that these meetings caused her stress, which she reported to her supervisors, but she was not disciplined during them or otherwise formally reprimanded. (*Id.* at 118). Allard also asserts that "numerous other similarly situated individuals" were not terminated by AHN after engaging in conduct similar to hers. (ECF No. 33, p. 3).

## II.    STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing the evidence. *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof[]" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

Federal Rule of Civil Procedure 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994) (stating that the nonmoving party must "point[] to sufficient cognizable evidence to create material issues of fact concerning every element as to which [he/she] will bear the burden of proof at trial"). "[A] complete failure of proof concerning an essential element" of the non-movant's claim "necessarily renders all other facts immaterial," and thus "there can be 'no genuine [dispute] as to any material fact'" sufficient to survive the motion. *Id.* at 323. Moreover, judgment as a matter of law becomes appropriate. *See id.*; *accord Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) ("[W]here a non-moving party fails sufficiently to establish the existence of an essential element of its case on

9

which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law.").

### III.    ANALYSIS

Allard claims that she was discriminated and retaliated against in violation of the ADA and PHRA. The ADA and the PHRA prohibit employers from discrimination against a qualified individual on the basis of a disability. 42 U.S.C. § 12112(a); 43 P.S. § 955(a). Because an "analysis of an ADA claim applies equally to a PHRA claim," the Court does not conduct a separate analysis of Allard's claims under the PHRA. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)). Where, as here, there is no direct evidence of discrimination, the Court assesses Allard's discrimination and retaliation claims under the well-known *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–806 (1973); *see also Walton v. Mental Health Ass'n. of Se. Pa.*, 168 F.3d 661, 667–668 (3d Cir. 1999) (citing *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 68 n.7 (3d Cir. 1996)) ("The *McDonnell Douglas* Title VII burden shifting rules apply to claims of discriminatory treatment under the ADA."); *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003) ("A 'pretext' claim of illegal retaliation follows the familiar burden shifting analysis ... set forth in *McDonnell Douglas*..."). Under that framework, a plaintiff bears the initial burden of establishing a prima facie discrimination or retaliation claim; the burden then shifts to the defendant to show a legitimate non-discriminatory or non-retaliatory reason for the adverse employment action at issue; and the burden then shifts back to the plaintiff to show that the non-discriminatory or non-retaliatory reason is a pretext for unlawful discrimination or retaliation. *See Walton*, 168 F.3d at 668.

The standards for establishing a prima facie claim for discrimination and retaliation differ. For a plaintiff to establish a prima facie case of discrimination under the ADA, the plaintiff must show: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination. *Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) that she engaged in protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *Daniels v. School Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015). AHN argues that Allard has failed to adduce evidence to establish either a prima facie discrimination or retaliation claim, and that even if she had done so, a non-discriminatory and non-retaliatory reason exists for terminating her. The Court concurs.

As to her retaliation claim, the parties do not dispute that Allard has post-partum depression and post-traumatic stress disorder, which qualify as disabilities under the ADA. (ECF No. 24, ¶¶ 42, 49); (ECF No. 34, ¶¶ 42, 49); *see Williams v. Sec'y Pa. Dep't Corr.*, 117 F.4th 503, 528 (3d Cir. 2024) ("'[M]ental illness qualifies as a disability under' the ADA."). They do not dispute that she engaged in the behavior that led to her termination. (ECF No. 24, ¶¶ 105–109); (ECF No. 34, ¶¶ 105–109). They do not dispute that she was qualified for her position. (ECF No. 51, ¶ 276). Allard's prima facie case falters because she cannot prove that she was terminated because of her disability.

Allard maintains that AHN was extraordinarily motivated to terminate her, and that the events underlying this case provided them a pretextual reason to do so. (ECF No. 33, p. 26). She

11

also argues that her termination is evidence of discrimination because other similarly situated nurses were not terminated for similar conduct. (*Id.* at 23). However, no reasonable jury would believe that Allard was terminated on discriminatory grounds. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). The evidence of record is clear that Allard violated AHN's standards of conduct on January 22, 2023. No genuine issue for trial exists regarding the details of Allard's conduct in the NICU on January 22, 2023. AHN deemed her undisputed behavior so disruptive and detrimental to its standards of conduct that it considered her termination necessary after accommodating her disability with paid leave. Allard has failed to adduce evidence suggesting that the reason for her termination was fabricated. Furthermore, there is no evidence in the record that indicates Allard's mental health diagnoses played a role in AHN's decision to terminate her. Allard has not established a prima facie case of disability discrimination under the ADA and PHRA.

The burden of production does not shift to AHN to articulate a legitimate, nondiscriminatory reason for terminating Allard, but that reason—a clear violation of AHN's standards of conduct—is already part of the record. Nevertheless, Allard argues that the event that led to her termination was the result of a mental health crisis. (ECF No. 33, p. 22). Even if Allard's conduct occurred only because of her mental health disabilities, AHN is not required by law to tolerate or excuse misconduct it otherwise would not condone. *See Sper v. Judson Care Center, Inc.*, 29 F.Supp. 3d 1102, 1114 (S.D. Ohio) ("An employer, however, is not required to tolerate or excuse disability-related misconduct as a reasonable accommodation to the plaintiff") (citations omitted). Requiring others—like critically ill patients, their families, and fellow nurses—to

tolerate misconduct is not the kind of accommodation contemplated by the ADA. *See McElwee v. County of Orange*, 700 F.3d 635, 645 (2d Cir. 2012).

The argument that Allard experienced pretextually disparate treatment from other similarly situated individuals is also unavailing. The prima facie case and pretext inquiries often overlap. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008). In order to show pretext, a plaintiff must submit evidence which (1) casts doubt upon the legitimate reason proffered by the employer such that a fact-finder could reasonably conclude that the reason was a fabrication; or (2) would allow the fact-finder to infer that discrimination was more likely than not a motivating or determinative cause of the employer's termination. *Id.* (citations omitted). To avoid summary judgment, a plaintiff must put forward "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (quoting *Fuentes*, 32 F.3d at 765). Pretext may also be demonstrated by presenting evidence that similarly situated persons not within the plaintiff's protected class were treated more favorably by the defendant employer. *Wright v. Providence Care Center, LLC*, 822 F. App'x 85, 92 (3d Cir. 2020) (citing *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998)). Comparator employees must be "similarly situated in all respects," including by having "engaged in the same conduct." *In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)) (cleaned up). Such a showing demands a fact-intensive inquiry on a case-by-case basis. *Parker v. Farley*, 625 F. App'x 77, 82 (3d Cir. 2015) (quoting *Monaco v. Am. Gen Assurance Co.*, 359 F.3d 296, 305 (3d Cir. 2004)). In the context of disciplinary cases or personnel actions, employees can be established as similarly situated by "showing that the two employees

13

dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (citations omitted). Therefore, the Court looks to whether the comparators offered by Allard engaged in disorderly outbursts, were subject to the same standards, reported to Cohen and/or Chiaramonte, and any differentiating or mitigating circumstances that would distinguish their conduct or treatment by AHN.

Allard points to ten other nurses who received only written or verbal warnings or reprimands for conduct that Allard describes as similar to, or worse than, hers. (ECF No. 36, pp. 23–26). Allard highlights AHN's retention of Sarah Smoker ("Smoker")—whose conduct relating to a patient care incident violated the same standard of conduct that Allard's termination was based upon—as evidence of more favorable treatment than she received. (ECF No. 36, p. 24); (ECF No. 40, p. 3). Smoker was found to have used profanities in front of a patient, slammed that patient's personal cellphone on the bedside table, and pulled that patient's hair to keep the patient in her bed. (ECF No. 40, p. 2). As with Allard's, Cohen and Snyder were involved in Smoker's disciplinary action and exercised decision-making authority over it. (*Id.*); (ECF No. 35-3, pp. 101–102). Unlike Allard's incident, Snyder explained that Smoker's conduct was found to be in response to an agitated and aggressive patient. (ECF No. 35-3, p. 99–100). Therefore, it was determined that although Smoker's conduct warranted discipline, it was taken to prevent a coworker from being injured. (*Id.* at 99). On the other hand, Allard's conduct while serving as charge nurse was viewed by Cohen—her manager—as a disruption to the operation of her entire unit. (ECF 35-2, pp. 71–74). Thus, Smoker—who was not serving as a charge nurse at the time of her discipline-related incident, whose conduct was pursuant to an evidently dangerous situation with a patient, and who did not engage in a disorderly outburst—is not a valid comparator.

The Court's review of the disciplinary actions taken against the other nurses that Allard provides as comparators reveals that their conduct did not involve disruptions of patient care or disturbances that pulled other nurses away from their assignments. Also, none of the nurses reported to any of the individuals involved in the investigation of Allard's conduct. (ECF Nos. 41–49). Thus, this comparator evidence is unpersuasive, as none of them engaged in conduct comparable to the incident that led to Allard's termination. Consequently, Allard's comparator-based pretext argument fails.

There are no weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in AHN's proffered legitimate reasons for terminating Allard. No nurse who witnessed Allard's conduct tells a conflicting story of what happened, and the reason Allard was provided for termination has always been the same—her conduct on January 22, 2023. Judgment will be entered in favor of the defendants as to Allard's discrimination claims under the ADA and PHRA.

As to Allard's retaliation claims, the parties do not dispute that her request for medical leave after the January 22, 2023, incident was a protected activity, nor do they dispute that she was terminated after undertaking that protected activity and then returning to work. (ECF No. 23, p. 13). Allard maintains that "[t]he fact that [she] requested accommodations shortly before returning to work, and was terminated the day that she returned from medical leave, while others who engaged in similar or worse conduct were provided written warnings, is demonstrative [of] Defendants' discriminatory and retaliatory motive." (ECF No. 33, p. 29). The Court disagrees. There is no evidence of record that creates an inference that a causative link existed.

A causation analysis often, but not exclusively, rests on two key factors: "(1) the temporal proximity between the protected activity and the alleged retaliation and (2) the existence of any pattern of antagonism in the intervening period." *Jensen v. Potter*, 435 F.3d 444, 450 (3d Cir.

15

2006) (internal quotation marks omitted). "The Court measures temporal proximity from the date on which the litigant engaged in his first protect[ed] action." *Gairloch v. Pa. State Univ.*, 84 F. Supp. 3d 407, 418 (M.D. Pa. 2015) (citing *Blakney v. City of Phila.*, 559 F. App'x 183, 186 (3d Cir. 2014)). "Timing alone raises the requisite inference when it is 'unusually suggestive of retaliatory motive,' but even if 'temporal proximity ... is missing, courts may look to the intervening period for other evidence of retaliatory animus.'" *Jensen*, 435 F.3d at 450 (quoting *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503–04 (3d Cir. 1997)). In the absence of unusually suggestive temporal proximity or a pattern of antagonism, courts "consider all of the proffered evidence as a whole to determine whether it may suffice to raise the inference" of causation. *Straka v. Comcast Cable*, 897 F. Supp. 2d 346, 367 (W.D. Pa. 2012) (quotation omitted); *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000) ("Although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference.").

As has been stated throughout, the evidence is clear that Allard's employment was terminated for violating AHN's standards of conduct following an investigatory process that AHN affords all employees. AHN retained Allard for approximately eight months after granting her request for medical leave. Although she was terminated immediately after returning from that leave, that only occurred after she had an opportunity to respond to the allegations against her in a previously scheduled investigatory interview. That investigatory interview was originally scheduled for January 31, 2023, and was postponed until October 6, 2023, because Allard informed AHN (through her husband) that she would not attend the original meeting one hour before it was set to begin.

In certain narrow circumstances, an "unusually suggestive" proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection. *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) (citations omitted). What really matters is the context surrounding the medical leave, as temporal proximity between protected activity and an adverse employment action "merely provides an evidentiary basis from which an inference can be drawn." *Id.* (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997)). In the context of a medical leave request, engaging in that protected activity does not provide "free reign" to disregard workplace rules. *See Wright*, 822 F. App'x at 95 (holding that a nurse's termination—for engaging in a "loud, heated" verbal altercation in violation of her employer's policies and in a patient care setting—was clearly based upon her misconduct and not the medical leave she had taken a few months earlier).

AHN granted Allard's leave request while informing her that her investigatory meeting would be rescheduled upon her return. She was already the subject of a disciplinary action before her leave began, and based on the undisputed record before the Court, that leave almost totally occupied the period between Allard's violation of AHN's standards of conduct and her investigatory interview. In other words, a reasonable jury could not find that AHN retaliated against Allard for taking leave, because its accommodation of her request to do so postponed a disciplinary meeting and subsequent action that was set to occur *before* she requested leave. So it belies belief that AHN only terminated Allard because she took leave and, even then, it had clearly articulated a legitimate reason to do so.

It is also notable that Allard considers AHN's treatment of her post-January 2023 accommodation requests as reasonable and fair, foreclosing any argument that AHN retaliated

against those requests.  (ECF No. 24, ¶ 197).  Finally, no evidence exists to support, nor does Allard allege, that AHN antagonized her while she was on leave.

Absent any facts that would allow a reasonable jury to view Allard's termination as retaliatory, the Court holds that no causal relationship exists between Allard's leave request and her termination.  Even if she had established a prima facie case of retaliation, as discussed above, Allard failed to garner evidence that demonstrates any weaknesses, implausibilities, incoherencies, or contradictions in AHN's proffered legitimate reason for terminating her employment.  No reasonable factfinder could rationally find AHN's reason unworthy of credence.  The Court will enter judgment in favor of the defendants with respect to Allard's retaliation claims under the ADA and PHRA.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment will be granted by Order of Court to follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

7/6/26
Dated